UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

NAHSHON JACKSON, 95A2578,

                                    Plaintiff,

            -v-                                                    DECISION AND ORDER

GLENN S. GOORD, et al.,                                     06-CV-6172 CJS

                                    Defendants.

———————————————————

APPEARANCES

For Plaintiff:          Nahshon Jackson, *pro se* [1]
                        95-A-2578
                        Collins Correctional Facility
                        Box 340
                        Collins, New York 14034-0340


For Defendants:         Gary M. Levine, A.A.G.
                        New York State Attorney General's Office
                        144 Exchange Boulevard, Suite 200
                        Rochester, New York 14614


INTRODUCTION

    This is an action pursuant to 42 U.S.C. § 1983, in which Plaintiff, a prison inmate[2]

in the custody of the New York State Department of Correctional Services ("DOCS")[3],

alleges that Defendants, all employees of DOCS, violated his federal constitutional rights.

———————————————

    [1]Defendants provided Plaintiff with the Notice to *Pro Se* Litigants required by Local Rule of Civil Procedure 56.2. (Docket No. [#29]).

    [2]State records indicate that Plaintiff was convicted of robbery and murder.  However, Plaintiff maintains that he is not lawfully in DOCS custody, and is the victim of a conspiracy.  Plaintiff's writing, "The Confederate Order," discussed further below, describes the conspiracy.  However, the lawfulness of Plaintiff's incarceration by the State of New York is not before the Court.

    [3]After the motions were briefed, DOCS changed its name to New York State Department of Corrections and Community Supervision.

Now before the Court are Defendants' Motion for Summary Judgment [#27] and Plaintiff's Cross-Motion for Summary Judgment [#37].  For the reasons that follow, Defendants' motion is granted in part and denied in part, and Plaintiff's cross-motion is denied.

BACKGROUND

On September 26, 2003, while Plaintiff was housed at Attica Correctional Facility ("Attica"), he was walking to his job at the facility law library, when he was stopped by Corrections Officer Fleckenstein ("Fleckenstein"), who searched a file of papers that Plaintiff was carrying. (Plaintiff's Deposition "Pl. Dep." at 17-19).  In searching the file, Fleckenstein observed documents pertaining to an organization named Association for Community Teamwork ("ACT"), a non-profit corporation of which Plaintiff was the President.[4]  Previously, Plaintiff had been told by DOCS officials that he could possess four pages of documents pertaining to ACT.  Specifically, in or about 2003, officials at Attica confiscated certain mail from Plaintiff concerning ACT, and he filed an inmate grievance. *See, Jackson v. Goord*, 305 A.D.2d 839, 840, 758 N.Y.S.2d 558 (3d Dept. 2003). Ultimately, *see id.*, on May 21, 2003,  DOCS's Central Office Review Committee ("CORC") determined that Plaintiff could have four pages of the confiscated mail returned to him. See, [#37-2] at 20.  The four pages  consisted of "various literature related to the Association for Community Teamwork Inc.  To include two form letters, one Certificate of appointment, and one Certificate of Association." *Id*. at 22.  Notably, CORC's decision did not explain why Plaintiff was entitled to have those documents, and what, if any, documents were not returned to him.  Nor did CORC indicate that Plaintiff was able to

---

[4]ACT was incorporated on June 24, 1998, by Plaintiff's aunt and cousin. Pl. Dep. at 37.

establish ACT as an inmate organization.  Moreover, Plaintiff admits that ACT was not an approved inmate organization, and that he had not applied to have ACT approved as an inmate organization, though he had considered doing so. *Id*. at 38-40, 79.   Of the documents that Fleckenstein seized from Plaintiff's file, one was a letter written by Plaintiff on ACT letterhead, dated "September, 2003," which was obviously created after the CORC decision. *See*, Levine Declaration, Ex. B.

In addition to the ACT materials, Fleckenstein found other documents in Plaintiff's possession, some of which he surmised were created using Attica's law library's computer.  Specifically, they are: 1) a letter, written by Plaintiff, to the "Nation of Gods & Earth[5], North, South, East & West," from "The Nation of Gods & Earths, Attica State Prison," containing the names, identification numbers, and locations of nineteen prisoners ; 2) correspondence regarding the Nation of Gods and Earths; and 3)  a writing entitled "The Confederate Order," which purports to be Plaintiff's statement to the U.S. Congress concerning a conspiracy to deprive him of his rights.[6]

Upon discovering these materials, Fleckenstein issued Plaintiff a misbehavior report, charging him with three infractions: 1) possessing unauthorized organization materials; 2) smuggling; and 3) misuse of state property.  With regard to the unauthorized organizations violation, Fleckenstein's misbehavior report refers to ACT, "which is not a DOCS approved

---

[5]For a description of this group, also known as "five percenters," see *Patrick v. LeFevre*, 754 F.2d 153, 155 (2d Cir. 1984); *see also, Buford v. Coombe*, 199 F.3d 1321, 1999 WL 980953 at *1 (2d Cir. Oct. 8, 1999) (unpublished), describing the group as "a quasi-religious sect descended from the Nation of Islam."  The group has since been recognized as a religion for purposes of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See, Marria v. Broaddus*, 2004 WL 1724984 at *1 (S.D.N.Y. Jul. 30, 2004).

[6]*See*, Pl. Dep. at 45-46 ("It was a manifesto that I was writing about my personal experience dealing with the court system[.]").

organization," and "another non DOCS organizational group with other inmates' names and numbers," apparently referring to the Nations of Gods & Earth letter, which contains such information.  Fleckenstein's report indicates that he turned the confiscated materials into the facility's contraband office.

Fleckenstein notified defendant Corrections Sergeant Norcross ("Norcross") concerning his search of Plaintiff's file, and Norcross authorized Fleckenstein to search Plaintiff's cell.  Fleckenstein searched Plaintiff's cell and confiscated two "draft bags" of documents, including additional documents pertaining to ACT,  Plaintiff's personal letters and diary, and literature concerning various religions.  Some of the documents allegedly indicated that Plaintiff was soliciting membership in ACT among inmates and persons outside the prison,[7] that he had provided legal advice to an inmate, and that he was requesting that someone outside the prison send him cigars to sell inside the prison.  On October 2, 2003, Norcross issued a second misbehavior report, charging Plaintiff with five infractions: 1) soliciting goods or services; 2) smuggling; 3) unauthorized organization activity; 4) violation of facility correspondence rule; and 5) providing unauthorized legal assistance.   Regarding the charge for unauthorized organization activity, Norcross's misbehavior report states, in pertinent part: "While going through the papers I found that Jackson is and has been soliciting inmates and civilians to join the unauthorized organization (ACT). . . .  Papers also show that inmate Jackson is having D. Morris send materials for ACT into DOCS facilities by marking them Legal Mail." Norcross Misbehavior Report dated October 2, 2003.

---

[7]*See*, Tier Hearing transcript at 3.  Plaintiff contends that he was not attempting to establish ACT as an inmate organization. Pl. Dep. at 40.

Defendant Randy James ("James"), Deputy Superintendent for Security at Attica, ordered that Plaintiff be placed in the Special Housing Unit ("SHU") pending his disciplinary hearing. In the SHU, Plaintiff was initially given clothing that was dirty, or at least stained. *Id*. at 23. After he complained, Plaintiff was given different clothing. *Id*. at 24. Plaintiff was unable to sleep because of noise being made by other inmates. There were security cameras in the SHU, including in the shower area, and Plaintiff believes that the cameras invaded his privacy. Plaintiff went on a hunger strike to protest his placement in SHU and the conditions in the SHU. Plaintiff wrote to Attica's Superintendent, defendant James Conway ("Conway"), to complain about the conditions in the SHU and to notify Conway that he was on a hunger strike. Conway did not intervene in Plaintiff's hunger strike, which lasted fourteen days. *Id*. at 25-26. However, Conway responded that Attica's Medical Department typically oversaw hunger strikes. *See*, Conway Memo to Plaintiff dated September 30, 2003. Subsequently, Plaintiff, who was taking fluids, was seen by facility medical staff at various times during his hunger strike. A nurse came through the SHU for sick call each day, and a doctor provided Plaintiff with sleeping pills. Pl. Dep. at 65.

On October 10, 2003, defendant James Kennedy ("Kennedy"), a hearing officer at Attica, concluded Plaintiff's disciplinary hearings on Fleckenstein's and Norcross's misbehavior reports. Kennedy found Plaintiff guilty of smuggling and unauthorized organizational activities, but not guilty of damaging/misusing state property. In his written determination, Kennedy observed that Plaintiff believed that he was entitled to possess materials pertaining to ACT, "due to the decision in a prior superintendent's proceeding."[8]

---

[8]Plaintiff states that on October 6, 2002, hearing officer Lieutenant Coffey issued a decision, indicating that Plaintiff was authorized to possess materials concerning ACT.

However, Kennedy found that Plaintiff was not entitled to engage in organizational activities for ACT, since ACT was not an authorized prison organization. Kennedy imposed a total sentence of 90 days keeplock[9] and 90 days loss of privileges. [10]  Upon completion of the hearing, Plaintiff was released from SHU, to begin serving his keeplock sentence. Accordingly, Plaintiff spent fourteen days in SHU before being released to keeplock. *See*, Pl. Dep. at 28.

Plaintiff appealed Kennedy's ruling to Conway, and on October 23, 2003, Conway reversed Plaintiff's conviction on Norcross's misbehavior report, and affirmed Plaintiff's conviction on Fleckenstein's misbehavior report, which reduced Plaintiff's keeplock sentence to 45 days. Plaintiff again appealed, and on November 20, 2003, Donald Selsky ("Selsky"), DOCS Director of Special Housing/Inmate Discipline, reversed the conviction on Norcross's misbehavior report, and expunged Plaintiff's record. Plaintiff served about a month in keeplock before the reversal. *See*, Pl. Dep. at 28, 30, 59.).  Such keeplock confinement consisted of Plaintiff being confined to his usual prison cell, where he ate his meals. *See*, Pl. Dep. at 31 ("I was in general population, but I was confined to a regular cell.").

On November 23, 2003, Plaintiff wrote to James and requested the return of the materials that were seized from his cell. On December 3, 2003, James denied Plaintiff's request. Plaintiff then wrote to Conway, and on December 29, 2003, Conway responded

---

[9]"'Keeplock' is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. Lefevre*, 891 F.2d 38, 39 (2d Cir. 1989) (citation omitted).

[10]Plaintiff maintains that Kennedy knew that ACT was not an organization that needed the approval of Attica officials, but found him guilty anyway, in order to punish him for exercising his right to "engage in ACT charitable activities." Complaint [#1] ¶ 33.

that Plaintiff was not permitted to have materials pertaining to ACT, since it was an unauthorized organization. The facility retained documents pertaining to the Nation of Gods and Earth in Plaintiff's file,[11] and had Plaintiff mail the ACT documents out of the facility to family members.

On October 14, 2003, Plaintiff filed an inmate grievance, seeking a determination that the search of his cell was not authorized by DOCS rules,[12] and also seeking the return of the confiscated items. Plaintiff also sought a declaration that ACT was an organization that did not need approval from DOCS. Additionally, Plaintiff complained about the conditions in the SHU, and he maintained that his confinement in SHU was improper. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance. On November 7, 2003, Plaintiff filed an inmate grievance, demanding that he be provided with his property and that he be able to witness the collection and storage of his property. IGRC denied the grievance, and on January 21, 2004, Conway denied Plaintiff's appeal. On March 3, 2004, the Central Office Review Committee ("CORC") accepted Plaintiff's appeal in part. On November 6, 2003, Norcross issued a memo, indicating that "all" papers pertaining to ACT had been mailed out of the facility, and that the papers concerning the Nation of Gods and Earths had been put in Plaintiff's file. On November 7, 2003, Conway sent a memo to Plaintiff which stated that "ACT is not an authorized organization and you

---

[11]Plaintiff alleged that the facility's retention of the Nation of Gods and Earth materials was improper, since, as discussed further below, a district court had ruled that DOCS must recognize the group as a religious entity.

[12]Plaintiff argued that DOCS rules only permit cell searches when there is a reasonable cause to believe that contraband will be found. He further states that the documents which Fleckenstein seized from him, prior to the cell search, were not contraband, since he was not charged with possessing contraband. He maintains, therefore, that there was no reasonable cause to believe that there was contraband in his cell.

are not permitted to solicit membership in an unauthorized organization."

On November 24, 2003, Plaintiff filed a grievance seeking the return of his property. IGRC denied the grievance, and on December 23, 2003, Conway denied Plaintiff's appeal. On February 18, 2004, CORC affirmed Conway's ruling.  In that regard, CORC indicated that although DOCS was in the process of preparing a program to accommodate the religious practices of the Nation of Gods and Earths, materials pertaining to the group were "currently considered unauthorized materials and should be disposed of in accordance with Directive #4422, Section III.G.4."  CORC further indicated that the ACT materials were contraband, and that after being given his "disposal options," Plaintiff had chosen to have the materials mailed "out of the facility," presumably to a family member.

In December 2003 and January 2004, Plaintiff filed additional grievances demanding the return of seized religious materials and materials pertaining to ACT. Conway denied both grievances, and CORC affirmed Conway's rulings.

On April 28, 2004, Plaintiff filed an inmate grievance against unnamed staff who allegedly harassed him in C Block. *See*, Pl. Request for Discretionary Review dated May 20, 2004.  On May 1, 2004, Plaintiff was elected by his fellow inmates to serve as an inmate representative on Attica's IGRC.  On May 2, 2004, Plaintiff filed a grievance against unnamed staff members who allegedly conspired to intimidate him. *Id*.  On May 9, 2004, Plaintiff, who was housed in C Block, filed an inmate grievance against  A Block officers who searched him as he was returning to his cell from the visiting room.  On May 12, 2004, Plaintiff was transferred from C Block to A Block. Complaint ¶ 55.  On May 17, 2004, Corrections Sergeant Burlow ("Burlow") interviewed Plaintiff concerning the grievances that he had recently filed. *See*, Pl. Request for Discretionary Review dated May 20, 2004.

8

On or about May 18, 2004, Burlow issued Plaintiff a misbehavior report for violating the facility's phone policy, which limited calls to 15 minutes.  According to the misbehavior report, on April 22, 2004 and May 13, 2004, Plaintiff violated Directive 4423 by having thirty-minute phone calls, in violation of the fifteen-minute call limit.  Plaintiff was placed in keeplock pending the outcome of his hearing. Pl. Dep. at 96.  Also that day, James ordered that Plaintiff undergo urinalysis for drug use.  Corrections Officer Bochynski ("Bochynski") collected Plaintiff's urine sample, and Corrections Officer Connor ("Connor") tested the sample using the ETS+ Automated Drug Analyzer. See, Connor Misbehavior Report dated May 19, 2004.   Connor reportedly conducted two tests, both of which indicated that Plaintiff had used cannabinoids.  On May 19, 2004, Connors issued Plaintiff a misbehavior report for violating Rule 113.24, which prohibits drug use.  Plaintiff maintains that the test results were false.

On May 18, 2004, at Burlow's direction Corrections Officer Odachonski ("Odachonski") searched Plaintiff's cell and seized various documents.  As a result, on June 14, 2004, Norcross issued Plaintiff another misbehavior report, charging him with a Tier III infraction, for possessing documents pertaining to ACT and engaging in unauthorized organizational activity, in violation of Rule 105.12.  In that regard, Norcross indicated that Plaintiff possessed "many pages of typed and written information about an organization called Action for Community Team Work (ACT)[.] [T]his is an unauthorized organization by DOCS[.] [W]ithin the material Jackson is trying to recruit inmate members from the Attica Correctional Facility inmate population." Hearing Transcript at 2.

On May 20, 2004, Corrections Lieutenant Dougherty conducted a Tier II disciplinary hearing on the phone infraction, and found Plaintiff guilty.  According to Dougherty's written

9

disposition, Plaintiff admitted that he exceeded the fifteen-minute phone call limit, but did not think that it was a problem because no one was waiting to use the phone, and because no one warned him that this time had expired, until after 30 minutes had elapsed.  Plaintiff also argued that pursuant to Directive 4423(8)-(E)(6), he was permitted to use the phone for up to thirty minutes.  Plaintiff admitted that Conway had discretion to limit that to 15 minutes, which he had done in a memorandum dated December 3, 2002, but Plaintiff argued that the reason Conway had done so was only to ensure that other inmates would not be prevented from using the phone.  Plaintiff further argued that a buzzer or other warning should have sounded after fifteen minutes.  Dougherty disagreed and imposed a sentence of 30 days keeplock and 30 days loss of phone. Plaintiff did not actually serve the keeplock sentence, however, because in the interim he was keeplocked on the separate Tier III disciplinary charge for drug use. Pl. Dep. at 102.

On May 20, 2004, Plaintiff appealed Dougherty's ruling to Superintendent Conway, alleging that he was being retaliated against for filing grievances.  Specifically, Plaintiff alleged that on May 17, 2004, Burlow interviewed him regarding his grievances, and that subsequently he received the aforementioned misbehavior reports.  Plaintiff alleged that Burlow was retaliating against him, by filing misbehavior reports regarding the phone, and by selecting him for urinalysis and a cell search.  He also alleged that Dougherty imposed the maximum sentence, 30 days keeplock, in order to prevent Plaintiff from acting in his capacity as an elected IGP representative.  On May 24, 2004, James denied the appeal, and indicated that there was no evidence of a conspiracy against Plaintiff.  Conway denied Plaintiff's request for discretionary review and appeal.

On May 26, 2004, Corrections Counselor J. Roach ("Roach") concluded a Tier III

10

disciplinary hearing on the drug  misbehavior report.  At the hearing, James testified that the urinalysis was not random, and that Plaintiff was part of a group that he had specifically selected for testing, based on information that he had obtained. Hearing Transcript ("I identified him as part of [a] group.  There's nothing random about it.  It was [sic] he was selected by me because of definite and specific material.").  However, James declined to explain the reason for the testing.  Plaintiff maintained that the test result was false, because  the tested urine was not his, and that he was set up in order to remove him from the Inmate Grievance Program.   However, Bochynski testified that the urine sample that he collected was Plaintiff's, and Connors testified to the procedures he followed when testing the urine.  At the conclusion of the hearing, Roach found Plaintiff guilty of drug use, and imposed a sentence that included twelve months in SHU and loss of good time credit. Pl. Dep. at 111.  Roach's disposition also indicated that Plaintiff would be removed from his position as an Inmate Grievance Program Representative for a period of 24 months. Plaintiff appealed, and on July 22, 2004, Keith Dubray ("Dubray"), Acting Director for Special Housing/Inmate Disciplinary Program, reduced the sentence to six months in the SHU. Pl. Dep. at 111.[13]

On June 19, 2004, Corrections Lieutenant Monin ("Monin") conducted a disciplinary hearing on the misbehavior report charging Plaintiff with unauthorized organizational activity.  Norcross testified that he had checked with DOCS Deputy Superintendent for

---

[13]Prior to that, while still at Attica, on May 27, 2004, Plaintiff filed an inmate grievance, indicating that unidentified officers were retaliating against him, by flooding his cell with water and/or chemicals, damaging his property, and interfering with his television reception. Plaintiff believes that the water entered his cell through a ventilation duct, and that corrections staff must therefore have put the water there, to retaliate against him. Pl. Dep. at 132-133. Plaintiff contends that James is liable for the incident, because he notified James about it and James did not do anything. Pl. Dep. at 131, 133. However, James would have no personal involvement merely because he was notified of a constitutional violation after the fact.

Programs to see whether ACT was an authorized organization, and was advised that it was not. Hearing Transcript at 18.  However, Plaintiff advised Monin that he had already been charged with possessing ACT materials, and that the conviction was later set aside. *Id*. at 10.  Moreover, he disputed whether the documents for which he was being charged had actually been in his cell.[14]  In that regard, Plaintiff indicated that the documents which Monin had at the hearing were confiscated from him at some earlier time, and that DOCS officials must have held the documents until there was an opportune time to use them to retaliate against him.[15]  In addition, he stated that he did not actually attempt to recruit any inmates to join ACT.  On June 26, 2004, Monin found Plaintiff guilty, and imposed a sentence that included ninety days of keeplock and loss of privileges. *Id*. at 28.  Plaintiff appealed, and on July 2, 2004, Conway suspended the sentence for 180 days, and as a result, Plaintiff served his SHU conviction for drug use, but did not serve any additional time as a result of the conviction for possessing ACT materials. Pl. Dep. at 124-125.

Plaintiff served his SHU Sentence at Upstate Correctional Facility ("Upstate"). Pl. Dep. at 141-142.  Plaintiff was placed in a two-man SHU cell with inmate Devon Toney ("Toney").  On October 24, 2004 and October 30, 2004, Plaintiff wrote grievances indicating that he and Toney were "on the verge of causing 'blood-shed' among one another."  On November 15, 2004, Plaintiff filed a grievance indicating that there were

---

[14] He stated that he only possessed "5 pages of typed written material, identified as a proposed Constitution and By-laws" for ACT.

[15] *See*, appeal letter to Commissioner Goord dated June 26, 2004, at p. 2 ("I offered a written statement to support my claim alleging that there exists no written proof that after 9/26/03 I was in possession of the ACT material.  It is alleged that this particular material, used to punish me previously, has surfaced again from an unknown source, for the purpose of arbitrarily administering disciplinary actions against me."). He maintains that after the tier conviction, arising from the mbr's written by Fleckenstein and Norcross, on 10/31/03 the ACT materials were sent "out of the facility through a visitor." Id., addendum at p. 1.

"irreconcilable differences" between himself and Toney, which were "on the verge of erupting into violence." On November 15, 2004, Sergeant Gill ("Gill") interviewed Plaintiff about his concerns. Pl. Dep. at 147-148. Plaintiff told Gill that Toney was mentally ill, and that he was afraid that he would have to defend himself if Toney attacked him. *Id*. at 149. Plaintiff noted, for example, that on one occasion, Toney became angry when Plaintiff gave him a food tray that he did not want. Pl. Dep. at 151. However, Gill decided that it was not necessary to separate the two. On November 17, 2004, Toney pulled Plaintiff onto the floor from the top bunk, while Plaintiff was sleeping. Plaintiff felt pain in his shoulder and leg as a result of falling to the floor. *Id*. at 157-158. Immediately following that incident Plaintiff was placed in a different cell.

Plaintiff was subsequently transferred from Upstate to Clinton Correctional Facility ("Clinton"), where he was given another misbehavior report for using marijuana. Pl. Dep. at 160. Plaintiff received a 60-day keeplock sentence, and he served 40 of those days back at Upstate, in SHU. *Id*. at 161-162. Plaintiff alleges that such placement in SHU to serve a keeplock sentence violated his rights and violated DOCS Directive 4933. *Id*. at 162-163. Plaintiff filed a grievance, which Woods denied. *Id*. at 164.

On March 27, 2006, Plaintiff commenced this action, naming Goord, Conway, James, Kennedy, Monin, Dougherty, Norcross, Roach, and Woods as defendants. Plaintiff's Complaint [#1] asserts the following causes of action: 1) unlawful search and seizure of items from his cell at Attica on September 26, 2003 (Norcross seized the materials, violating his right to privacy, Conway and James refused to return the items,

13

violating his right to association and religion);[16] 2)  unlawful conditions of confinement in Attica's SHU between September 26, 2003 and October 10, 2003 (James violated due process by placing Plaintiff in SHU in violation of 7 NYCRR  § 251-1.6(d), and Conway violated Plaintiff's 8th amend rights by ignoring his conditions in SHU, while both James and Conway violated Plaintiff's 1st and 14th amend rights by allowing his property to be withheld and destroyed); 3) retaliation against Kennedy, for imposing sentence to deter Plaintiff from associating with ACT or possessing its materials;[17] 4) refusal to return confiscated material even though it was not contraband, against James, Conway, and Goord (Goord's liability is based on fact that Plaintiff wrote to him, and he referred the matter to a subordinate. Pl. Dep. at 74); 5) retaliation (phone, urinalysis, search of cell, water in his cell, search and confiscation of property on June 3, 2004, false misbehavior report regarding possession of ACT material)  against Conway, James, Norcross; 6) disciplinary actions in furtherance of conspiracy (essentially a procedural due process claim against Dougherty[18], Roach[19],

---

[16]Plaintiff alleges that his Fourth Amendment rights were violated when Norcross authorized the search of his cell, because he violated Directive 4910. Pl. Dep. at 32.  He also maintains that his First Amendment rights of freedom of association and religion were violated by the retention of his documents. *Id*. at 32-33, 52.

[17]Plaintiff alleges that Kennedy punished him for exercising his first amendment rights to possess ACT materials. Pl. Dep. at 69-72.  He is not claiming a due process violation against Kennedy. Id. at 69.

[18]Plaintiff maintains that Dougherty, James, and Conway violated his due process rights, by failing to follow DOCS rules in connection with the telephone incident. Pl. Dep. at 130.

[19]Plaintiff alleges that Roach violated his rights by failing to enforce the procedural requirements in Directive 4937. Pl. Dep. at 115-116.  He also complains that Roach did not require James to explain why he had Plaintiff's urine tested. Pl. Dep. at 117.  He also complains that Roach did not let him ask Bochynski all of the questions that he wanted to ask. *Id*. at 118.  Plaintiff contends that Roach did these things because he was biased by retaliatory motive. *Id*. at 119.

Monin[20]; 7) failure to protect him from Toney, against Wood; and 8) violation of due proess for forcing him to serve his forty-day keeplock sentence in SHU at Upstate, against Wood and Goord.  Plaintiff demands declaratory and injunctive relief, compensatory damages, and punitive damages.

On January 6, 2010, following the completion of pretrial discovery, Defendants filed the subject motion [#27] for summary judgment.  With respect to their application, Defendants make the following arguments: 1) the official-capacity claim against Goord is barred by the Eleventh Amendment; 2) the Fourth Amendment cell-search claim must be dismissed, since inmates do not have an expectation of privacy in their cells; 3) the claim for lost property must fail, since New York State provides an adequate post-deprivation remedy; 4) the First Amendment freedom-of-association and freedom-of-religion claim must fail since Defendants were entitled to confiscate the ACT materials; 5) the pre-hearing SHU claim does not establish a constitutional violation; 6) the procedural due process claims fail because Plaintiff did not have a protected liberty interest, the hearing officers did not violate Plaintiff's due process rights, and any error was harmless; 7) the retaliation claims fail for lack of evidence; 8) the failure to protect claim fails because Woods was not personally involved and was not deliberately indifferent to Plaintiff's safety; and 9) the claim concerning Plaintiff's keeplock sentence at Upstate's SHU must fail,

---

[20]With regard to the Monin hearing, Plaintiff states that he was never shown the confiscated materials that were seized. Pl. Dep. at 122.  Plaintiff also alleges that Monin violated his rights by preventing him from reading a statement into the record. Pl. Dep. at 126.  As to that, Monin took the statement, but Plaintiff does not know whether he considered it. *Id*. at 127.  Plaintiff also contends that Monin relied on an unsigned confidential letter from an executive deputy director. *Id*. at 127. Plaintiff also alleges that Monin denied his request to call Sgt. Matthias as a witness, who purportedly would have testified that Plaintiff had previously begun the process to apply to have ACT recognized as an inmate organization. *Id*. at 128-129. However, Plaintiff testified to that fact himself, and admitted that he never went forward with the process of having ACT recognized as an inmate organization.

because Defendants were not personally involved, and because such placement was authorized by law.

On April 15, 2010, Plaintiff filed the subject cross-motion [#37] for summary judgment. He contends that he is entitled to summary judgment for the following reasons: 1) the search of his cell by Fleckenstein violated DOCS procedures, specifically Directives 4422 and 4910; 2) the refusal to return the property taken from his cell, which was not contraband, violated his rights of freedom of association, freedom of expression, and freedom of religion; 3) Defendants should have conducted a pre-deprivation hearing; 4) his pre-hearing detention in Attica's SHU, without a hearing, ordered by James, violated due process and did not comply with state regulations (7 NYCRR § § 301.2 & 301.7); 5) Conway was deliberately indifferent to Plaintiff's pre-hearing conditions of confinement in the SHU; 6) Kennedy retaliated against him, to punish him for his association with ACT; 7) there was a conspiracy between James, Dougherty, and Roach to retaliate against him (phone, urinalysis, ACT materials, removal from IGP), which Goord and Conway did not stop; 8) Roach and Monin violated his due process rights at the hearings; 9)  the dispositions by Roach, Dougherty, and Monin should be reversed and expunged; 10) Woods was deliberately indifferent to Plaintiff's safety; and 11) Woods violated his rights by "allow[ing] the continuance of [the] policy or custom" of placing keeplocked inmates in SHU, contrary to 7 NYCRR § § 301.6(a)(2) & 251-1.7, and Directive 4933.

DISCUSSION

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

16

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where,

17

"after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).   The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
>
> \*\*\*
>
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004);

*see also, Platt v. Incorporated Village of Southampton*, 391 Fed.Appx. 62, 2010 WL

3393738 at *3  (2d Cir. Aug. 30, 2010) ("A supervisory official may be personally liable if he or she has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.  Supervisory liability may be imposed where an official demonstrates gross negligence or deliberate indifference to constitutional rights by failing to act on information indicating that unconstitutional practices are taking place.  We cannot say, however, that an allegation that a supervisory official ignored a letter protesting past unconstitutional conduct is, without more, sufficient to state a claim that the official was 'personally involved' in the unconstitutional conduct.") (citations and internal quotation marks omitted).[21]

### *The Search of Plaintiff's Cell and Failure to Return His Property*

Plaintiff contends that Norcross violated his right to privacy, by searching his cell in violation of DOCS Directive 4910, which authorizes a search when there are reasonable grounds to believe that an inmate possesses contraband.  He maintains that the documents which Fleckinger initially seized from him were not contraband, and that Norcross therefore did not have reasonable cause to authorize a cell search.  He further alleges that Conway and James violated his rights by refusing to return the seized materials to him.

It is well-settled that "a convict has no expectation of privacy in his prison cell." *Willis*

_____

[21]Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009), there is some disagreement among district courts in this Circuit as to whether all of the foregoing "*Colon* factors" still apply. *See, e.g., Dilworth v. Goldberg*, 2011 WL 3501869 at * 17 (2d Cir. Jul. 28, 2011) ("*Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision.") (collecting cases).  It is unclear whether *Iqbal* overrules or limits *Colon*, therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors. *See, Platt v, Incorporated Village of Southampton*, 391 Fed.Appx. 62, citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, which sets forth all five of the *Colon* bases for imposing supervisory liability.

*v. Artuz*, 301 F.3d 65, 66 (2d Cir. 2002) (*citing Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194 (1984)).  Accordingly, Norcross is entitled to summary judgment on Plaintiff's claim that his Fourth Amendment right to privacy was violated by an unreasonable cell search. Moreover, to the extent that Plaintiff is maintaining that any Defendant violated his due process rights by refusing to return seized property, that claim must fail, since the New York State courts provide adequate post-deprivation remedies. *See, Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) ("[T]he confiscation of [the inmate's] eye-glasses did not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies.") (citations omitted).

In addition to his due process claims, Plaintiff contends that the refusal to return the property violated his rights to freedom of association and freedom of religion.

As for his claimed right of association, "there is no generalized constitutional right of social association." *Dickman v. Mangiaracina*, 199 F.3d 1321, 1999 WL 980966 at *2 (2d Cir. 1999) (unpublished).  The freedom of "expressive association," to which Plaintiff refers, "protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, exercise of religion, or petitioning for the redress of grievances.  These are the so-called 'political' associational rights." *Sanitation and Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 996-997 (2d Cir. 1997).   Of course, prison inmates' rights in this area are limited, since "the Government can infringe the first amendment rights of prisoners so long as the restrictions are reasonably and necessarily related to the advancement of some justifiable purpose of imprisonment." *Birzon v. King*,  469 F.2d 1241, 1243 (2d Cir. 1972) (citation omitted).  In that regard,

20

> [t]he governing standard is one of reasonableness. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. The prisoner-plaintiff bears the burden of proving that a disputed regulation is unreasonable.
>
> The reasonableness of a prison regulation is measured by the three-step analysis outlined by the Supreme Court in *Turner [v. Safley]*, 482 U.S. [78,] 89-91, 107 S.Ct. 2254 [(1987)]. First, we ask whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective. Second, we look to see whether there are alternative means of exercising the right that remain open to prison inmates. Third, we examine the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison.

*Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (citations and internal quotations omitted). In this case, the relevant regulations are Directive 4760 and Rule 105.12, which regulate inmate organizational activities. *See*, James Aff., Exs. A and B. More specifically, Rule 105.12 prevents prisoners from engaging in organizational activities involving organizations that are not authorized by the Deputy Commissioner of DOCS, and from possessing materials relating to such organizations. *Id*. The purpose of those rules is to "prevent disorder and control activities that could threaten the security of a correctional facility," and "to prevent activities sponsored by groups, gangs and other entities that promote radicalization, rebellion, violence or obstruction against other persons or in attempts to disrupt the safe and secure operation of the facility." James Aff. at ¶ ¶ 11-12. In support of Defendants' summary judgment motion, James indicates that the ACT documents were seized as contraband, "because they were related to an unauthorized prison organization." James Aff. at ¶ 5. Plaintiff maintains that he was entitled to possess the ACT documents, and, in support of his position, he relies on CORC's decision to return

21

four pages of ACT materials to him, after they were confiscated from the mail. However, there is no indication that CORC knew, when it made that decision, that Plaintiff was engaging in activities concerning ACT within the prison. At the hearing, Kennedy found that Plaintiff was engaged in unauthorized organizational activity *within the prison system*. Moreover, it is undisputed that ACT was not an approved inmate organization. Plaintiff has not shown that the rule prohibiting unauthorized organizational activities is unreasonable, and therefore, his freedom of association claim fails. *See, Leitzsey v. Coombe*, 998 F.Supp. 282, 286-288 (W.D.N.Y. 1998).

Plaintiff further claims that the refusal to return his property violated his right to free exercise of religion, in violation fo the First Amendment. *See*, Complaint [#1] ¶ ¶ 14-15. A detailed description of the legal principles applicable to such a claim was recently set forth as follows:

> Courts have long understood that prisoners retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.") (citations omitted); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (A "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir.2003); *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir.1999) ("Prisoners retain their right to religious freedom even when incarcerated."); *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997) ("[I]nmates are not stripped of their constitutional rights simply by virtue of their imprisonment, including their right to religious freedom.") (citation omitted).
>
> ***
>
> "'Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Ford v. McGinnis*, 352 F.3d at 588 (*quoting Benjamin v. Coughlin*, 905 F.2d at 574); *see, e.g., O'Lone v. Estate of Shabazz*, 482 U.S.

at 348-49, 107 S.Ct. at 2404; *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804; *Jackson-Bey v. Hanslmaier*, 115 F.3d at 1096.  A prison inmate retains First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804; *accord, e.g., Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir.2004); *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995).

The standard to determine whether a prison official's conduct violates an inmate's First Amendment free exercise rights is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin*, 905 F.2d at 574; *accord, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404-05; *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006); *Young v. Coughlin*, 866 F.2d 567, 569 (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3224 (1989); *see also, e.g., Ford v. McGinnis*, 352 F.3d at 588 ("The free exercise claims of prisoners are ... judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.") (internal quotations omitted).

In evaluating the constitutionality of a restriction on an inmate's religious rights, four factors are considered:  "1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest." *Salahuddin v. Coughlin*, 993 F.2d 306, 308-09 (2d Cir.1993) (*quoting Benjamin v. Coughlin*, 905 F.2d at 574); *accord, e.g., Salahuddin v. Goord*, 467 F.3d at 274; *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir.), *cert. denied*, 531 U.S. 881, 121 S.Ct. 193 (2000).  "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.' " *Graham v. Mahmood*, 2008 WL 1849167 at *12; *see also, e.g., Fromer v. Scully*, 874 F.2d 69, 73 (2d Cir.1989); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.1985) (this deference, however, is "by no means unlimited"); *Byrd v. Goord*, 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug. 29, 2005) (Daniels, D.J.).

 As in other areas of the law, a burden shifting approach applies:

> The prisoner must show at the threshhold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden

> of identifying the legitimate penological interests that justify the impinging conduct; "the burden remains with the prisoner to 'show that these [articulated] concerns were irrational.' "

> *Salahuddin v. Goord*, 467 F.3d at 274-75 (citations & fn. omitted); *accord, e.g., Johnson v. Guiffere*, 2007 WL 3046703 at *5; *Sproul v. Goord*, 2007 WL 2609787 at *11.

*Tafari v. Annets*, No. 06 Civ 11360(GBD)(AJP), 2008 WL 2413995 at *12-15 (S.D.N.Y. Jun. 12, 2008) (footnotes omitted), *report and recommendation adopted by Tafari v. Annets*, No. 06 Civ 11360(GBD)(AJP), 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), *affirmed*, 363 Fed. Appx. 80 (2d Cir. 2010), *cert den*., 130 S.Ct. 3475, *reh'g denied*, 131 S.Ct. 57 (2010).

In this case, Plaintiff maintains that his religious rights were violated, because some of the confiscated documents pertained to the Nation of Gods and Earths, while others consisted of "various of [sic] religious and educational literature, including Rastafarian, Judaism, Christian and Islamic texts, writings and essays." Complaint [#1] ¶ 7. The materials concerning the Nation of Gods and Earths were later placed in Plaintiff's DOCS file, since at that time DOCS was still working out the procedures to effectuate the ruling of the United States District Court for the Southern District of New York in *Marria v. Broaddus*, No. 97 Civ. 8297 NRB, 2003 WL 21782633 at *21 (S.D.N.Y. Jul. 31, 2003),  which directed "that DOCS conform its policies concerning the group known as the Nation of Gods and Earths with this ruling, and further that DOCS report the results of that policy reevaluation to the Court in sixty days."  As for the other documents, consisting of religious "texts, writings and essays," it is unclear what happened to them.[22]  However, in any event, there is no evidentiary proof in admissible form indicating that the retention of those materials substantially burdened

---

[22]It is possible that they were returned to other inmates, since Fleckenstein's contraband receipt indicated that certain books belonged to someone else. *See*, September 26, 2003 Contraband Receipt ("3 books – marked ownership other than inmate.")

24

Plaintiff's religious beliefs, or prevented him from practicing his faith. *See, e.g.*, Pl. Rule 56 Statement [#37] ¶ 22 (Plaintiff stated only that he "was not allowed to possess various religious materials that were confiscated."); *see also*, Pl. Memo of Law [#37] at 3, 15-17. Accordingly, Plaintiff's free exercise claim is dismissed.

### *Confinement in Attica's SHU*

Plaintiff maintains that his fifteen-day confinement in SHU, during the pendency of his disciplinary hearing in September-October 2003, violated his due process rights and Eighth Amendment rights. Specifically, he contends that James violated his due process rights by placing him in SHU, and that Conway violated his Eighth Amendment rights by ignoring the unconstitutional conditions in the SHU.

With regard to Plaintiff's due process claim, the relevant legal principles are well settled:

> "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'...." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir.2004) (*quoting Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (alteration in original)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Id.* (*quoting Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998)). This Court noted in *Colon v. Howard*, 215 F.3d 227 (2d Cir.2000), that restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual. *Id.* at 231-32 & n. 5. We have also stated that SHU confinements of fewer than 101 days "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65.

*\*\*\**

[Courts are] required to examine the conditions of confinement "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir.1999). In making such a determination, courts are required to examine the actual circumstances of confinement, *see Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir.1997); *Miller v. Selsky*, 111 F.3d 7, 8-9 (2d Cir.1997), and to identify with specificity the facts upon which their conclusions are based, *see Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir.1997) ("[W]e have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement.") (citations omitted); *Frazier [v.Coughlin]*, 81 F.3d [313,] 317 [(2d Cir. 1996)].[23] This Court has stated that "[d]isputes about conditions may not be resolved on summary judgment." *Palmer*, 364 F.3d at 65 (citing Wright, 132 F.3d at 137-38). Only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law. *Id.*

*Davis v. Barrett*, 576 F.3d 129, 133-134 (2d Cir. 2009).

Here, the record does not indicate any dispute concerning the conditions of Plaintiff's SHU confinement. Consequently, the Court finds, for purposes of this decision, that Plaintiff was subject to standard SHU conditions.[24] *See*, Pl. Dep. at 29. Additionally, Plaintiff contends that he was initially given used clothing with stains, which was replaced after he complained, that the noise-level created by inmates made it difficult for him to

---

[23]*But see, Davis v. Barrett*, 576 F.3d at 135 ("[T]his Court has required a 'detailed factual record,' unless 'the period of time spent in SHU was exceedingly short-less than [ ] 30 days ...-and there [is] no indication that the plaintiff endured unusual SHU conditions.'") (*quoting Palmer v. Richards*, 364 F.3d at 65-66).

[24]"Under the normal conditions of SHU confinement in New York, the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors are permitted, but the frequency and duration is less than in general population. The number of books allowed in the cell is also limited." *Palmer v. Richards*, 364 F.3d 60, 66 n.3 (2d Cir. 2004) (citations and internal quotation marks omitted).

sleep,[25] and that there was a lack of privacy when showering.[26]   Moreover, although his meals were delivered to him, he elected to engage in a hunger strike, during which he drank water and  was monitored by facility medial staff.  On these facts, the Court finds that Plaintiff's fifteen-day SHU stay did not impose an atypical and significant hardship in relation to the ordinary incidents of prison life.   Therefore, Plaintiff did not have a liberty interest in remaining free from pre-hearing detention in SHU, and James is entitled to summary judgment on the due process claim.

As for his Eighth Amendment claim against Conway,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of  and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Phelps v. Kapnolas*, 308 F.3d 180, 185-186 (2d Cir. 2002) (citation omitted).  In the instant case, Plaintiff has not shown that his conditions of confinement, during his fifteen days in SHU, posed an excessive risk to his health or safety, or that Conway was deliberately indifferent to such danger.  Plaintiff complained about stained clothing, and it was replaced.  He complained that the noise was preventing him from sleeping, and medical staff gave him sleeping pills.   He further contends that some inmates in SHU were mentally ill.  Plaintiff's complaints about a lack of privacy in the showers obviously does not involve a

---

[25]Attica's medical staff provided him with sleeping pills, but he indicates that the medication bothered his stomach because he was on a hunger strike.

[26]Although Plaintiff also refers to anecdotal evidence of SHU inmates committing unhygienic acts, of which he alleges Conway was aware, he does not contend that he personally witnessed or was the victim of such acts.  Plaintiff merely relies on an unrelated lawsuit, *Hamilton v. Conway*, 03-CV-0527E(Sc), in which Conway, in a 2005 interrogatory response, indicated that he had seen feces thrown in the SHU, and had reviewed reports concerning it, but had no recollection of dates. See, [#37-2] at p. 38.

risk to his health or safety.  Moreover, when Plaintiff refused to eat in protest, the medical

staff monitored him, and he did not suffer any harm.  Such facts do not establish an Eighth

Amendment violation.  Accordingly, Conway is entitled to summary judgment on this claim.

<u>Retaliation by Kennedy</u>

Plaintiff next maintains that Kennedy retaliated against him, by finding him guilty at

the disciplinary hearing and imposing a 90-day keeplock sentence. See, Complaint [#1] ¶

¶ 31-38.   In that regard, Plaintiff alleges that he engaged in protected activity, by

"exercising his First Amendment right to engage or encourage others to engage in lawful

organizational activities and possess not-for profit materials belong to ACT," and that

Kennedy retaliated against him for doing so, in order "to deter Plaintiff from associating with

ACT and its associates in the future and possessing its materials." *See, id*. at ¶ 38, 31.

The general legal principles applicable to inmate First Amendment retaliation claims are

clear:

> Courts properly approach prisoner retaliation claims with skepticism and
> particular care, because virtually any adverse action taken against a prisoner
> by a prison official-even those otherwise not rising to the level of a
> constitutional violation-can be characterized as a constitutionally proscribed
> retaliatory act.  Thus, . . . a plaintiff asserting First Amendment retaliation
> claims must allege (1) that the speech or conduct at issue was protected, (2)
> that the defendant took adverse action against the plaintiff, and (3) that there
> was a causal connection between the protected speech and the adverse
> action.

*Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citations and internal quotation marks

omitted).  "In order to satisfy the causation requirement, allegations must be sufficient to

support the inference that the [protected] speech played a substantial part in the adverse

action." *Id*. at 354 (citation and internal quotation marks omitted).  Furthermore, even where

a plaintiff can establish prima facie case, the defendant may prevail by showing that he

would have disciplined the plaintiff even in the absence of the protected conduct. *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998), *cert den*. 525 U.S. 907, 119 S.Ct. 246 (1998).

Applying these principles, the Court first finds that Plaintiff's possession of ACT materials, and his actions in engaging in organizational activity concerning ACT, were not protected activity.  For reasons already discussed above, ACT was not an authorized inmate organization, and Plaintiff therefore did not have the right to establish ACT as an inmate organization, or to possess its materials for that purpose.  Additionally, there was evidence that Plaintiff was violating Rule 105.12,  since, for example, there was evidence that he was using someone outside the prison to send ACT materials to other inmates. Because of that, Kennedy found Plaintiff guilty of unauthorized organizational activity, and not merely of possessing ACT materials. *See*, Hearing Transcript at 7 ("Kennedy:  Okay, the report says that . . . Jackson is and has been soliciting inmates and civilians to join his unauthorized organization ACT.").  Plaintiff's contention that Kennedy's disposition and/or sentence was retaliatory is conclusory and unsupported.  Accordingly, Kennedy is entitled to summary judgment on the retaliation claim.[27]

### *Retaliation by Norcross, James and  Conway*

Plaintiff next alleges that Norcross, James, and Conway retaliated against him after he filed grievances, including an inmate grievance on or about May 9, 2009, in which he complained that officers from A Block had searched him in a disrespectful manner and

---

[27]Plaintiff did not plead a due process claim against Kennedy.  Even if he had, such claim would lack merit.  For example, there is no indication that the thirty days that Plaintiff spent in keeplock, before his conviction was reversed, imposed a significant and atypical hardship.

denied him recreation for no reason.  In addition to that protected activity, Plaintiff further alleges that these Defendants retaliated against him because he was elected as an inmate representative to the Inmate Grievance Panel.  Moreover, Plaintiff alleges that because of this protected activity, Norcross, James and Conway conspired to retaliate against him, by filing false misbehavior reports against him, charging him with telephone violations, drug use, and possession of ACT materials.  More specifically, he contends that within one week of filing a grievance against A Block officers, and of being elected to the Inmate Grievance Panel, he was transferred to A Block without explanation, and then hit with a series of false misbehavior reports.  He denies that he used marijuana.  He further denies that he possessed ACT materials in June 2004, and contends that such materials were actually confiscated during his cell search on September 26, 2003, and then retained until they could be used to retaliate against him.[28]  Consequently, the evidence upon which he relies to establish a causal nexus is the temporal proximity between the protected activity and the misbehavior reports, and his testimony that the misbehavior reports were false.

In moving for summary judgment on these claims, Defendants maintain that there is "no evidence" of retaliation. *See*, Def. Memo at 20-22.  On this point, Defendants rely on Plaintiff's deposition testimony, wherein he indicated that none of the Defendants expressly told him that they were retaliating against him. *Id*. at 21.  Otherwise, Defendant's argument

---

[28]On this point, the Court understands Plaintiff to be indicating that the ACT materials for which he was charged in June 2004 were the same materials for which he was charged in September 2003.  The Court further understands him to be alleging that although the ACT materials were purportedly mailed out of the facility by staff after his October 2003 conviction was reversed, they were actually retained and then used to file a false, retaliatory misbehavior report against him in June 2004. See, Pl. Memo of Law [#37] at p. 10 ("[T]he ACT material had been confiscated by Fleckenstein on 9/26/03 and delivered to Norcross.  The ACT material was being used *again* by Norcross for the purpose of arbitrarily administering disciplinary actions against Plaintiff.") (emphasis added, citation omitted).

on this point is fairly brief and conclusory:

> [T]here is no evidence that any defendant retaliated against plaintiff by the implementation of the telephone, urinalysis and search policies. The policies were imposed on all inmates in the facility. There is no evidence that anything done was the result of retaliation. The retaliation claim should be dismissed.

*Id*. at 22. Notably, Defendants did not submit affidavits from Conway or Norcross, and although they did submit an affidavit from James, it does not directly address the retaliation claims.

The elements of claim for retaliation were already set forth above. Here, Plaintiff has come forward with evidence that he engaged in protected activity, and that Defendants took adverse actions against him. The issue before the Court is whether Plaintiff has come forward with sufficient evidence of a causal connection between the protected speech and the adverse actions. On this point, it is clear that temporal proximity between protected activity and disciplinary action "may serve as circumstantial evidence of retaliation. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). The Court is mindful that such circumstantial evidence, without more, may not be enough to defeat summary judgment on a prisoner retaliation claim. *Id*. at 873. On the other hand, where circumstantial evidence of retaliation is "sufficiently compelling, direct evidence is not invariably required." *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003). In this case, to establish the required causal nexus, Plaintiff relies primarily on the close temporal proximity between the protected activity and the adverse action, as well as his contention that he was innocent of disciplinary charges. Such evidence does not strongly establish causal nexus. On the other hand, Defendants'

motion on this point is weak, and does not directly address Plaintiff's claim.[29]  Accordingly, the Court finds that there are issues of fact that preclude summary judgment on the retaliation claim against Conway, James and Norcross.

*Procedural Due Process*

Plaintiff is asserting procedural due process claims against Dougherty, Roach, and Monin, arising from the three disciplinary hearings that were held concerning the misbehavior reports issued on May 13, 2004 (telephone policy), May 19, 2004 (drug use), and June 14, 2004 (possessing ACT material).  The legal standard for such claims was set forth above, as part of the discussion concerning Plaintiff's fifteen-day pre-hearing confinement in SHU.  As discussed therein, a liberty interest is only implicated where the hearing results in discipline that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  In addition, where an inmate never serves the disciplinary sentence, he does not suffer a due process violation. *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992).  Applying these principles, the Court finds that Defendants are entitled to summary judgment on the due process claims involving the hearings conducted by Dougherty and Monin, since Plaintiff never served any disciplinary sentence as a result of either hearing.  As to the hearing conducted by Dougherty, he imposed a thirty-day keeplock sentence, which Plaintiff never served, because he was already being keeplocked in connection with another investigation. *See*, Pl. Dep. at 98-

---

[29]See footnote 20 above.  The Court also observes that after Plaintiff filed his response to Defendants' motion, Defendants did not file a reply, even though the Court had already granted permission for them to do so. *See*, Amended Motion Scheduling Order [#35].

102.[30]  As for the hearing conducted by Monin, he imposed a sentence of 90 days keeplock and loss of privileges, but Conway suspended the sentence.  Consequently, Plaintiff did not serve the sentence imposed by Monin. See, Pl. Dep. at 125 (Plaintiff indicated that he never served any additional time in keeplock as a result of Monin's hearing and sentence). Accordingly, Defendants are entitled to summary judgment on the due process claims involving the hearings conducted by Dougherty and Monin, because neither hearing resulted in an atypical or significant hardship.

The Court will now consider Plaintiff's due process claims concerning the hearing conducted by Roach.  As are result of that hearing, Plaintiff was sentenced to six months (120 days) in SHU, one year loss of good-time credits and privileges, and a two-year ban from serving on the Inmate Grievance Panel. Pl. Dep. at 111.   Plaintiff maintains that Roach violated his rights, in the following ways: 1) he declined to dismiss the charge, after Plaintiff presented evidence that the officer who collected his urine did not follow the procedural requirements of Directive 4937 (Pl. Dep. at 115-116); 2) he declined to compel James to explain the reason why he had selected Plaintiff for urinalysis, which inhibited Plaintiff's defense, which was to show that James's motive was retaliation (*Id*. at 116-117); 3) he limited Plaintiff's examination of Corrections Officer Bochynski, when Plaintiff was attempting to show that he had made a false entry on the urinalysis test form (*Id*. at 118); 4) he did not advise Plaintiff of all of his due process rights (*Id*. at 119); and 5) he was biased against Plaintiff because of retaliatory motive (*Id*. at 119).   In moving for summary

---

[30]More specifically, see Plaintiff's Deposition at page 102, lines 7-21.  Plaintiff appealed Dougherty's determination and sentence to Conway, and Conway responded that the 30-day keeplock sentence was moot at that point, because Plaintiff was being held on a separate Tier III disciplinary charge.  Plaintiff also testified that the "Tier III superseded the keep–lock time for the phone." *Id*.

judgment, Defendants contend that Roach did not violate Plaintiff's due process rights, for the following reasons: 1) even if the urine-testing guidelines were not followed, violations of state procedural rules do not constitute a deprivation of due process; 2) plaintiff had the opportunity to question James about the reason why he was selected for  urinalysis; and 3) plaintiff had sufficient opportunity to explore the circumstances regarding the urinalysis, since he was able to question two Corrections Officers, a  Corrections Sergeant, and the Deputy Superintendent for Security.   Defendants further contend that even if Roach violated Plaintiff's due process rights, that James, Conway, and Goord were not personally involved.

The legal principles applicable to due process claims in the context of prison disciplinary hearings are well settled:

> The Fourteenth Amendment to the U.S. Constitution provides "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held a disciplinary hearing for a prison inmate implicates the due process clause if the hearing results in the imposition of an atypical hardship upon the inmate. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir.2004); *see Superintendent v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); *Wolff v. McDonnell*, 418 U.S. 539, 563-64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

> Although not entitled to the "full panoply of rights" afforded by the due process clause, *Sira*, 380 F.3d at 69, the due process clause does give inmates several procedural safeguards at prison disciplinary hearing. These safeguards include:

> 1. An advance written notice of the charges against the inmate (*Wolff*);

> 2. A hearing affording the inmate a reasonable opportunity to call witnesses and present documentary evidence (*Wolff*);

3. A fair and impartial hearing officer (*Wolff*);

4. A determination supported by "some evidence" (*Hill*); and

5. A written statement of disposition, including the evidence relied upon and the reasons for the disciplinary actions taken (*Wolff*).

*Sira*, 380 F.3d at 69 (*citing Wolff*, 418 U.S. at 563-67, and *Hill*, 472 U.S. at 455); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir.1999); *see also Johnson v. Goord*, 305 F. App'x 815, 817 (2d Cir.2009) (*citing Sira* and *Kalwasinski*).

*Vaughn v. Nichols*, No. 9:02-CV-1512, 2010 WL 681409 at *3 -4 (N.D.N.Y. Feb. 24, 2010), *affirmed*, 423 Fed. Appx. 100 (2d Cir. Jun. 3, 2011).   Here, there is no dispute that Plaintiff was given advance written notice of the charges against him, and that he was given a written statement of the disposition, which explained the evidence that was relied upon and the reasons for the disposition.   Instead, Plaintiff argues that Roach denied him a reasonable opportunity to question witnesses, that Roach was biased, and that Roach's decision was not supported by sufficient evidence.

In considering Plaintiff's claim, the Court has carefully reviewed the disciplinary hearing transcript and supporting documentation.   At the outset, it is clear that Roach's decision was supported by "some evidence."   In that regard, "[t]he some evidence standard, detailed in *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), is satisfied if  there is any evidence in the record that supports the disciplinary ruling." *Vaughn v. Nichols*, 2010 WL 681409 at *5 -6  (citation and internal quotation marks omitted).   Roach's determination, that Plaintiff used drugs, was supported by two separate urinalysis test reports and  the testimony of the witnesses who collected and tested

Plaintiff's urine.  Accordingly, Roach's determination was supported by some evidence.[31]

The Court further finds that Roach did not deny Plaintiff a reasonable opportunity to question witnesses or to present evidence.  On this issue, Bochynski testified concerning the procedures that he followed in collecting and storing Plaintiff's urine.  *Id*. at 30-34. Plaintiff complains that there is a discrepancy on Bochynski's forms regarding the time of day that Bochynski collected Plaintiff's sample.  In that regard, Plaintiff contends that he did not actually give Bochynski the sample until some time after the time indicated on the form, because he initially was unable to urinate when Bochynski ordered him to do so. *Id*. at 34-36.  However, such fact is insignificant and does not indicate that Plaintiff's due process rights were violated.   Plaintiff raises a number of other complaints about the hearing.  For example, he requested a copy of a written order by James, directing that his urine be tested, and Roach denied the request because there was no such written order. Hearing Transcript at 5.  Additionally, Plaintiff requested to see the original written log for the urine-sample refrigerator, and Roach provided him with a handwritten copy of the information in the log, but not the actual log itself.  *Id*. at 8-9.  Plaintiff had wanted to see the actual log, in order to determine whether Bochynski made the proper entries.  Roach denied that request, but indicated that Plaintiff could ask Bochynski directly whether he made the entries attributed to him.   Plaintiff alleges that these rulings by Roach denied him due process, but the Court disagrees.   Plaintiff also complains that there was a discrepancy on one of the forms, since it indicated that his urine was tested randomly,

---

[31] Roach's written disposition indicates that he relied on the report and testimony of Corrections Officer Connors, who tested the urine, Bochynski, who collected the urine, and Corrections Officer Connors, who approved the testing, as well as Plaintiff's past disciplinary record for drug use.

when it was not a random test.  That error, though, is insignificant, since the misbehavior report itself expressly states that Plaintiff was part of an "identifiable group of inmates" that was designated for testing by James, and James also testified to that fact.

Plaintiff also alleges that Roach was biased, because he was part of a conspiracy to retaliate against him.    However, Plaintiff makes only conclusory allegations on that point, while the record gives no indication that Roach was biased.  Therefore, Plaintiff has not raised a triable issue of fact as to Roach's impartiality.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's due process claim arising from Roach's hearing.

### Failure to Protect

Plaintiff contends that Woods violated his rights by leaving him in a cell with Toney, who ended up pulling him from his bunk.  The Court disagrees, and finds that Woods is entitled to summary judgment.  For a claim alleging a failure to protect an inmate from harm, the applicable legal principles are clear:

> First, the prisoner must have been "incarcerated under conditions posing a substantial risk of serious harm." [*Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)].  Second, the prison official must have shown "deliberate indifference" to the prisoner's safety. *Id.*   Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

*Hines v. Lacy*, 189 F.3d 460, 1999 WL 642915 at *3 (2d Cir.1999) (unpublished).  At the outset, Plaintiff cannot show that Woods was personally involved in the decision to leave him in the same cell with Toney.  On this point, Woods has submitted a sworn statement, indicating that he did not learn of Plaintiff's complaint regarding  Toney until November 24,

2004, and by that time Plaintiff had already been moved to another cell.  Moreover, even assuming arguendo that Woods had become aware of Plaintiff's complaint sooner, Plaintiff cannot show that Woods was deliberately indifferent to a substantial risk of serious harm to him.  In that regard, the Corrections Sergeant who investigated Plaintiff's complaint determined that there was no need to separate Plaintiff and Toney, and Plaintiff has not shown any reason why Woods should have disagreed with the Sergeant's determination. Accordingly, Woods is entitled to summary judgment on the failure-to-protect claim.

*Claim that Plaintiff Was Improperly Transferred to Upstate
To Serve His Keeplock Sentence*

Plaintiff maintains that Woods and Goord violated his federal constitutional rights when he was transferred to Upstate, a double-bunk SHU facility, to serve his keeplock sentence.  At the outset, Plaintiff cannot show that Woods was personally involved in the decision to transfer him to Upstate, since Woods has submitted a sworn statement, indicating that he was not involved in the decision to transfer Plaintiff to Upstate to serve his keeplock sentence.  According to Woods, such "decisions are made out of [the] Classifications and Movements Office in DOCS Central Office, Albany, N.Y." Woods Aff. ¶ 16.  Plaintiff has not come forward with evidence to the contrary.  Nor has Plaintiff shown that Goord was personally involved in the transfer.

To the extent that Plaintiff is maintaining that Woods is liable because he failed to grant Plaintiff's grievance complaining about his placement at Upstate, the Court disagrees.  On this point, Woods indicates that Plaintiff's placement at Upstate was appropriate, pursuant to 7 NYCRR § 301.6(a) and DOCS Directives 0023 and 4933.  The Court agrees that 7 NYCRR § 301.6, entitled "Keeplock admission," indicates that inmates

38

assigned to keeplock status may be housed in Upstate's SHU, "for reasons such as, but not limited to," to serve a sentence from a Tier II or Tier III disciplinary hearing.  Moreover, Directive 0023, entitled "Upstate Correctional Facility," indicates that Upstate's function is "to house selected inmates serving disciplinary dispositions specifying assignment to a Special Housing Unit *or keeplock*" (emphasis added), and that "[i]nmates of any security classification are eligible for placement at Upstate."   Accordingly, Woods is entitled to summary judgment on this claim.

## CONCLUSION

Defendants' summary judgment motion [#27] is granted in part and denied in part, as follows:  It is denied as to the retaliation claim against Conway, James, and Norcross, and is otherwise granted.  Plaintiff's cross-motion for summary judgment [#37] is denied. The Clerk of the Court is directed to terminate Goord, Kennedy, Dougherty, Roach, Monin, and Woods as parties to this action.  The retaliation claim against Conway, James and Norcross may go forward.

Dated:       October 11, 2011
             Rochester, New York

                                              /s/ Charles J. Siragusa
                                              CHARLES J. SIRAGUSA
                                              United States District Judge